**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)**

| | |
|---|---|
| LaShawnna Ridley, Regina Ridley, Tiffany Hines, Stephine Hines, Preddy Ray, Dekeya Adams, Ricola Lawshea, and Latosha Sanderlin (STAKE.US USERS WITHIN THE UNITED STATES), Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>- v -<br><br>SWEEPSTEAKS LTD. d/b/a STAKE.US, KICK STREAMING PTY LTD., AUBREY DRAKE GRAHAM p/k/a DRAKE, ADIN ROSS, AND GEORGE NGUYEN,<br><br>Defendants. | Civil Action No. 1: 25-cv-2511-LMB-WEF<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs LaShawnna Ridley, Regina Ridley, Tiffany Hines, Stephine Hines, Preddy Ray, Dekeya Adams, Ricola Lawshea, and Latosha Sanderlin ("Plaintiffs"), by and through their attorneys, bring this action individually and on behalf of all others similarly situated (the "Class"), against Defendants Sweepsteaks Ltd. d/b/a Stake.us ("Stake.us"), Kick Streaming Pty Ltd. ("Kick"), Aubrey Drake Graham p/k/a Drake ("Drake"), Adin Ross ("Ross"), and George Nguyen ("Nguyen"), (collectively, "Defendants"). Plaintiffs make the following allegations upon information and belief (except those allegations as to the Plaintiffs or their attorneys, which are based on personal knowledge).

### NATURE OF THE ACTION

1.      This consumer class action seeks to stop Stake.us—an illegal online gambling platform owned and run by Sweepsteaks Ltd. and promoted by Kick, Drake, Ross and Nguyen, and an active collaborator in Drake's, Ross' and Nguyen's covert transmissions of money in

1

furtherance of their ongoing music "botting" campaigns—from continuing to prey upon consumers, and to impose civil penalties on all Defendants to deter future misconduct.

2.      In 2022, Ed Craven ("Craven") and Bijan Tehrani ("Tehrani") created Stake.us, a U.S. storefront for their international online casino, Stake.com.  Since then, Stake.us[1] has been operating as one of the largest and most profitable illegal online casinos since at least 2022.

3.      Craven and Tehrani created and marketed Stake.us to U.S. customers as a "social casino" that purportedly does not permit "real money gambling," to bypass applicable United States federal and Commonwealth of Virginia gambling regulations.

4.      Attempting unsuccessfully to hide behind the façade of a "safe and free gambling experience," Stake.us misrepresents itself to regulators and consumers; in reality, it operates as an illegal online casino.

5.      Stake.us offers nearly 2,000 casino games and permits players to place bets using specialized casino chips, and to cash out their winnings.

6.      Stake.us offers two types of virtual currency: Gold Coins and Stake Cash. Gold Coins have no monetary value and cannot be converted into real money. However, Stake Cash can be redeemed for cryptocurrency or digital gift cards at a rate of 1 Stake Cash to 1 United States Dollar. Stake.us bundles every purchase of Gold Coins with Stake Cash. Thus, when a player purchases Gold Coins to engage in casino games, they are also purchasing Stake Cash. If a player is lucky and wins, they can cash out their Stake Cash for cryptocurrency. But if a player loses their Stake Cash and wishes to continue gambling, they must buy more worthless Gold Coins, which will be bundled with more Stake Cash.

---

[1] Stake.com and Stake.us are referred to together herein, where applicable, as "Stake."

7.      To promote their illegal gambling operation after it was banned from being shown on certain livestreaming platforms, Craven and Tehrani founded Kick, which operates a streaming platform of the same name backed by Stake. Kick, entered into agreements with some of the country's most-watched live streamers to promote Stake to their millions of viewers.

8.      Among those streamers, Stake pays Defendants Drake and Ross to promote the platform. The two have engaged in live-streamed gambling, wagering large sums of money surreptitiously provided to them by Stake. In other words, though Drake and Ross purported to be gambling with their own Stake Cash, creating the false impression that they were risking their personal funds just like ordinary users, they were in fact using house-provided funds.

9.      This deceptive arrangement concealed the fact that Drake and Ross faced no genuine financial risk, while ordinary consumers who followed their lead and placed similar wages stood to lose real money. Through these and other promotions, Stake has bombarded consumers with advertisements appearing on social media platforms, depicting its games as safe, legal, and fun. But these casino games are illegal in Virginia and throughout the United States, and have inflicted harm on consumers across the Commonwealth who have lost real money chasing gambling wins on the Stake platform.

10.     Defendants Drake, Ross, and, upon information and belief, Nguyen also used Stake, including through its U.S. storefront Stake.us, to directly transfer money between and among themselves, using Stake's "Tipping" program--an unlimited and wholly unregulated money transmitter that appears to exist outside the oversight of any financial regulator. Defendants have utilized Stake's Tipping program to, *inter alia*, transfer gambling proceeds wagered through on the Stake platform.

11.    Through Stake's Tipping function, Defendants have financed their combined artificial streaming ("botting") to create fraudulent streams of Drake's music; fabricate popularity; disparage competitors and music label executives; distort recommendation algorithms; and distribute financing for all of the foregoing, while concealing the flow of funds.

12.    At the heart of the scheme, Drake--acting directly and through willing and knowledgeable co-conspirators--has deployed automated bots and streaming farms to artificially inflate play counts of his music across major platforms, such as Spotify. These inauthentic streams, injected via interstate digital pathways, were calibrated to mislead royalty and recommendation engines; manufacture popularity; distort playlists and charts; and divert both value and audience attention. In tandem, this manipulation has suppressed authentic artists and narrowed consumers' access to legitimate content by undermining the integrity of curated experiences.

13.    Stake.com's user-to-user Tipping and encrypted internal transfer mechanisms have fueled and enabled payments to bot operators and amplifiers to be hidden from public or regulatory view.

14.    Plaintiffs signed up for Stake accounts in reliance on Drake's endorsement of Stake.us and after seeing his promotional content depicting Stake.us as a legitimate platform. Drake's celebrity status, combined with his personal participation in gambling on the platform during livestreams, led Plaintiffs to believe that Stake.us was a lawful gambling experience when it in fact was not.

15.    Had Plaintiffs known that Defendants, including Drake, utilized the platform to "Tip" co-conspirators and employ their bot army, Plaintiffs would not have signed up for an account or spent money on the platform.

16.     One example of a publicly documented large-value tip is a $100,000 "Tipping" transfer between Defendants Drake and Ross in 2023.

17.     In December 2024, Drake gave away large sums of money in partnership with Ross and Stake as part of his "Drizzmas Giveaway."

18.     These Tips, and many others like them, cycled among Drake, Ross, and, upon information and belief, Nguyen—underwriting botting and paid engagement campaigns.

19.     Days before the filing of the original Complaint, Drake gave Ross a $220,000 car as a gift.

20.     Stake.us' platform's design, which masks counterparties and camouflages withdrawals as generic transactions, stymie scrutiny and obstruct tracing of illicit proceeds.

21.     "Tipping" proceeds and other transfers on and from Stake.com went, directly or indirectly, from Drake to, through, or with the knowledge and assistance of Ross, and on from there to, upon information and belief, Nguyen. Nguyen served as a facilitator and operational broker, alternately converting Stake-based cryptocurrency to cash, or receiving cash from Stake-transferred cryptocurrency proceeds. From there, Nguyen interfaced with bot vendors, supervised coordinated amplification strategies, and integrated paid "clipping" campaigns.

22.     The "clipping" campaigns were facilitated through the clipping service and affiliated networks on various platforms including X (formerly Twitter), Discord and Kick. Kick, in turn, is a betting platform financially underwritten by the founders of Stake. Public posts, chat logs, leaked communications and other records document Nguyen's direct handling of funds through multiple payment platforms, orchestration of narrative surges, and amplification alongside --and as an instrument of--Drake and Ross.

23.    When signing up for an account on Stake.us, users are prompted to accept certain conditions, including a mandatory arbitration clause and a class action waiver.

24.    Plaintiffs and the Class are Stake.us users who have been misled by Stake.us' misrepresentations that Stake.us is a legal, harmless, and safe gaming site, when it is in fact not legal, not harmless, and not safe.  Stake.us preys on consumers in Virginia and nationwide who are lured into real money gambling, exposing consumers to substantial risks of gambling addictions and jeopardizing their and their families' financial well-being. Each of the Plaintiffs was influenced to participate and to continue to participate after their initial participation on the Stake platform by the online promotional activities of Defendant Drake as viewed by each of the Plaintiffs.  If not for the Defendants' deceptive conduct, hiding the truth of the incestuous scheme among the Defendants from users, the Plaintiffs would never have become users of Stake.us in the first place.

25.    Plaintiffs and the Class have been further deceived into signing up for accounts on Stake.us, and spending money on Stake.us, unaware that Defendants, including Drake, were using this platform to transfer money between themselves utilizing Stake's "Tipping" feature to send money in untraceable ways and promote botting.  Had Plaintiffs been aware that Drake's endorsement was not a genuine reflection of his experience as a typical user, but rather a paid promotion masking his use of the platform as a vehicle for covert financial transfers, Plaintiffs would not have signed up for an account or spent money on Stake.

26.    Plaintiffs have also been further damaged by the false marketing manipulations and abuses of Defendant Drake, who, by his own public announcements, has been paid some $100,000,000 per year to promote Stake, as well as Defendants Ross and Nguyen, who have participated directly in the marketing of Stake.us, as documented in their many online posts across

multiple platforms advertising and endorsing Stake.  Defendant Drake's streaming fraud scheme is not only coordinated with Defendants Ross and Nguyen, but also bankrolled through Stake with Stake's knowledge and assistance.

27.     Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)–(d), and the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-196 et seq. Plaintiffs seek damages, treble damages under RICO, restitution and disgorgement, injunctive and declaratory relief, attorneys' fees and costs, and all other relief deemed just and proper.

28.     Plaintiffs' right to bring class-based RICO claims constitutes a statutory substantive right.

## JURISDICTION AND VENUE

29.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; members of the Class are citizens of States different from any Defendant; and Plaintiffs are citizens of the Commonwealth of Virginia.

30.     Defendant Sweepsteaks Ltd. d/b/a Stake.us is a Cyprus Limited Company with its principal place of business located at 28 Oktovrio, 313 Omrania BLD, Limassol, CY-3105, Cyprus.

31.     Defendant Kick Streaming Pty Ltd. is an Australian Proprietary Company with its principal place of business at 2/287 Collins Street, Melbourne, Victoria, 3000 Australia.

32.     Defendant Aubrey Drake Graham, p/k/a "Drake," is a Canadian domiciliary.

33.     Defendant Adin Ross is a Florida resident.

34.     Defendant George Nguyen is an Australian national, residing in New South Wales.

35.     This Court also has subject-matter jurisdiction pursuant to  28 U.S.C. § 1331 because Plaintiffs assert claims arising under RICO, 18 U.S.C. § 1962(c). The Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367(a).

36.     This Court also has jurisdiction under 18 U.S.C. § 1964(c).

37.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and upon information and belief, innumerable other potential members of the Class reside in this  District and Division.

38.     The Court has personal jurisdiction over Defendants because they transacted business, committed tortious acts, and caused injury in this District, and purposefully directed the conduct at issue here through interstate wires and platforms accessible and operated in this District.

## PARTIES

39.     Plaintiffs and the Class are Stake.us users within the United States, including in the Eastern District of Virginia, who, during the relevant period, were misled by the marketing practices of Defendants and were induced to participate in unlawful gambling on the Stake platform. Plaintiffs and the class suffered substantial financial and economic harm as alleged herein.

40.     Defendant Sweepsteaks Ltd. d/b/a Stake.us is a Cyprus Limited Company with its principal place of business located at 28 Oktovrio, 313 Omrania BLD, Limassol, CY-3105, Cyprus. Sweepsteaks also operates a U.S. office at 13101 Preston Road, Suite 110-5027, Dallas, TX 75240. Through its website and brand Stake.us, corresponding advertisements and promotions, including targeted advertisements, Stake.us intentionally conducts business in Virginia.  Upon information and belief, Stake.com and Stake.us were founded by, and are owned by Craven and Tehrani.

8

41.     Defendant Kick Streaming Pty Ltd. ("Kick") is an Australian Proprietary Company with its principal place of business at 2/287 Collins Street, Melbourne, Victoria, 3000 Australia. Upon information and belief, Kick was founded by, and still owned by, Craven and Tehrani.

42.     Defendant Aubrey Drake Graham, p/k/a "Drake," is a Canadian domiciliary. Drake is a well-known singer/songwriter whose music is available for streaming on Spotify. In fact, Drake is purportedly the most streamed artist of all time on the platform. In September 2025, Drake became the first artist to nominally achieve 120 billion total streams on Spotify. At all relevant times, Drake engaged in nationally promoted live streams and financial promotions connected to Stake.us that reached this District, and caused the other harms to Class Members residing within this District as described herein.

43.     Defendant Adin Ross is an online media personality and streamer who, at all relevant times, coordinated live streams and promotions on platforms accessible within this District, including streams featuring Stake.com Tipping, while maintaining close relationships with Drake and Nguyen relevant to the conduct alleged.

44.     Defendant George Nguyen is, upon information and belief, an Australian national residing in New South Wales who, at all times relevant, operated or co-founded entities or ventures including "Weekdays/Weekdays Capital" and "Clipping," and used online aliases including "Grand Wizard." Nguyen coordinated botting facilitation and paid amplification across U.S.-facing platforms and, upon information and belief, transacted in payments masked through Stake.us and Stake.com, including through their "Tipping" features, in connection with the same.

## FACTUAL ALLEGATIONS

### A.     Stake's Illegal Gambling Operation

45.     Since at least 2022, Defendants have perpetrated one of the largest and most profitable illegal online gambling operations in American history. Stake.us owns, operates and

promotes the casino. Defendants Kick, Drake, Ross and Nguyen promote the illegal casino to consumers and enable recruitment of new American players.

1. *The Stake.us Platform and its Services*

46.     Craven and Tehrani founded the online casino Stake.com in 2017 and operated it across the world. Because United States bans online casinos, Craven and Tehrani could not offer the Stake.com casino in the United States unless their gamblers used a virtual private network ("VPN" to access the website.

47.     In 2022, Craven and Tehrani launched Stake.us, a carbon copy of Stake.com, in 2022 to bypass such restrictions. Stake.us is almost identical to Stake.com. Both websites offer the same or substantially similar content, including online casino games such as slots, table games, and live dealer games. Additionally, both offer Gold Coins and Stake Cash.

48.     Just like Stake.com and other online casinos, Stake.us offers online casino games, including slots, table games, scratch cards, live dealer games, and exclusive "Stake Originals," all of which are games of chance. The outcomes of the casino games are decided by random number generation which, as Stake.us explains, "is an algorithm that produces a random sequence of numbers which cannot be predicted."

49.     Players bet virtual casino coins on these random outcomes, and if they win, then Stake.us pays them their winnings in virtual casino coins. Players can then cash out those coins for digital gift cards or cryptocurrency (*e.g.*, Bitcoin).

50.      In this respect, Stake.us does not hide the ball. Stake.us aggressively advertises the chance-based nature of its casino games to draw players in with the prospect of massive payouts.

51.     Here's how it works: Stake offers users two types of virtual currency: Gold Coins and Stake Cash. Gold Coins do not have monetary value and are described by Stake as solely for

entertainment purposes. Stake Cash, on the other hand, can be cashed out at a one-to-one exchange rate for US dollars and thus serves as the currency with which most bets are made.

52.     Users can buy Gold Coins or earn them through various promotions, and Stake characterizes Gold Coins as the primary currency for casual gameplay. With each purchase of Gold Coins, however, Stake bundles a set quantity of Stake Cash, which has actual monetary value and is the true currency with which Stake users place bets. Indeed, for every dollar spent on purchasing Gold Coins, Stake bundles a nearly equivalent amount of Stake Cash. For example, as of the date of this Complaint, a user could purchase 200,000 Gold Coins and $20.05 in Stake Cash for $20 USD.

53.     The Stake.us platform allows users to play casino games, such as roulette and virtual slot machines, which are pure games of chance. The outcome of these games is determined by random number generators. Users may bet Stake Cash on these online casino games with the prospect of a large payout—often many multiples of what was bet. Stake's virtual casino games involve no skill or strategy.

54.     Stake.us also features live dealer games, which allow users to "interact with human dealers" and experience "what it would be like to be at a land-based casino while you're sitting comfortably at home behind your computer screen or on your mobile device."[2] Stake's live dealer games are filmed in a studio and players may bet on the results—for example, of the spin of a roulette wheel or the next Blackjack card. Stake's live dealer games, like their counterpart in a brick and mortar casino, are games of chance.

---

[2] https://stake.us/blog/how-to-play-live-dealer-games.

55.     Stake.us conducts an illegal gambling business within the meaning of 18 U.S.C. § 1955, including by operating casino-type wagering in violation of multiple state laws, involving five or more persons, and in substantially continuous operation with substantial daily revenue.

56.     Publicly filed civil enforcement and consumer actions across multiple states accuse Stake.us of unlawful gambling operations.[3]

57.     Stake's online operations also violate Virginia law, Va. Code § 18.2-325, *et seq.*, which prohibits unlicensed, illegal online gaming. By providing a freely accessible online gambling forum accessible to consumers in the Commonwealth, Stake is flagrantly violating Virginia law and jeopardizing the health and safety of Virginia residents.

### 2. *Stake.us' Misrepresentations Regarding the Legality of Its Operation*

58.     Despite offering online casino games, Stake.us holds itself out in its various versions of its Terms and Conditions as a platform that does "not offer real money gambling" and claims that "no purchase or payment is necessary to participate or play [Stake.us] games."

59.     The Stake.us homepage claims it provides "the ultimate social, safe and free gaming experience."

60.     These representations are misleading as players are encouraged to wager Gold Coins or Stake Cash, or some combination of both, on the casino games, confusing consumers into believing they are participating in harmless and free gaming, when in fact, they are participating in gambling.

61.     Stake characterizes itself as a "Social Casino," which is intended to misrepresent the legality of the platform's operations. According to Stake, "A Social Casino refers to an online

---

[3] *See, e.g.*, *Wolters v. Sweepsteaks Ltd.*, No. 25-cv-3280 (D. Minn Aug. 15, 2025); *Dixon v. Sweepsteaks Ltd.*, No. 25-cv-9641 (D.S.C. Aug. 4, 2025); *Deleon v. Sweepsteaks Ltd.*, No. 25-cv-1481 (D. Mass. May 23, 2025); *Hall v. Sweepsteaks Ltd.*, No. 25-cv-00345 (D. Ala. May 2, 2025); *Urdan v. Sweepsteaks Ltd.*, No. 2-cv-03736 (N.D. Ill. Apr. 7, 2025); *Boyle v. v. Sweepsteaks Ltd.*, No. 25-cv-00302 (C.D. Cal. Feb. 14 2025).

platform that offers casino-style games for entertainment purposes, without involving real money. Instead, we use tokens (Gold Coins and Stake Cash). Users can enjoy a variety of casino games, such as slots, roulette and blackjack, but with the use of virtual currency—tokens—rather than real money."

62.    This is demonstrably false. Stake.us offers traditional casino games to its users, providing the option to place bets and cash in winnings. Stake.us consumers can receive Gold Coins or Stake Cash, or a combination of the two, to continue wagering bets on Stake.us's website. Stake Cash is purchased using cryptocurrency and its value is pegged to the U.S. dollar. If a user wins their bet, they can cash out Stake Cash for real money.

63.    Stake further misleads consumers by identifying in its terms of service certain states where its use is prohibited. Virginia is not among the states identified in this list, thus leaving the impression that using Stake is permissible in Virginia.

### 3. Kick, Drake, Ross, and Nguyen's Fraudulent Promotion of Stake.us

64.    Stake.us has created one of the largest illegal gambling enterprises in history. They did so in part by recruiting accomplices to promote Stake.us to massive fan bases.

65.    One accomplice knowingly and intentionally drove Stake.us to success by promoting the casino to Plaintiffs: Kick Streaming. Kick has created and curated an online platform designed to promote gambling at Stake's casinos. Kick recruited individuals to livestream their gambling on Stake.us, to create advertisements for Stake.us, and to leverage their fame to entice Plaintiffs and others across the United States to gamble and lose money at the Stake.us casino.

66.    Tehrani and Craven founded Kick Streaming in 2022—the same year as Stake.us—after Twitch, another major streaming provider, banned the streaming of Stake.com.

67.    There was no ambiguity about its purpose: Kick was created to facilitate the streaming of illegal gambling. In 2023, Mr. Craven reportedly acknowledged that Kick was losing money, but highlighted Kick's marketing value for Stake and the overlap in the shareholders between the two companies

68.    Kick targeted unlawful content by directly calling upon users to post content and prompting the type of content to be submitted. Kick entered into eight-figure contracts regarding streaming content, including with Defendants Drake and Ross.

69.    For example, in 2023 Drake reportedly signed a $100,000,000 per year endorsement deal with Stake for him to promote Stake within the United States.

70.    Similarly, in 2023, Kick reportedly entered an exclusive contract with Defendant Ross. Mr. Ross later stated that he was paid a guaranteed rate for livestreaming on Kick that exceeded $10,000 per hour.

71.    Mr. Ross is one of the most high-profile Stake.us streamers with 6.3 million followers on Instagram and 1.9 million followers on Kick.

72.    Ross and Drake livestreamed their gambling at Stake.us for hours at a time, garnering hundreds of thousands of viewers.

73.    For example, on or around November 25, 2021, Ross livestreamed himself on Kick betting $100,000 on a Stake Blackjack game.

74.    On or around April 14, 2025, Drake and Ross hosted a joint livestream where they gambled on Stake together.

75.    Drake and Ross have livestreamed their gambling on Stake.us to massive audiences, participated in advertisements for Stake.us, and leveraged their fame to entice Plaintiffs to gamble and lose money at the Stake.us casino.

14

76.     Livestreaming gambling on Kick by Drake, Ross, and others is particularly dangerous because many of their audiences are primarily young individuals. For example, Mr. Ross has claimed that most of his followers are teenagers or in their early 20s. This demographic is especially at risk for developing gambling addiction.

77.     Defendants Drake and Ross have been zealous promoters of Stake and have knowingly and intentionally driven Stake.us to success by promoting the casino to Plaintiffs.

78.     Drake has bet large sums on Stake and livestreamed the event, further promoting Stake to his millions of followers. Stake.us publicly stated that Drake "has been a long-time member of the Stake community," and ultimately a "partnership was formed" in which "a new gaming experience" will allow users to "have a chance to win big alongside Drake. This type of giveaway will be on a magnitude unseen before."[4]

79.     Drake's "Journey from a Player to a Partner" is documented on Stake's web properties, while Drake's social media accounts identify his partnership with Stake.

80.     During livestreamed events, Drake and Ross have made large bets on Stake using house money provided by Stake. This conduct simply encourages and influences the large fan base of Drake and Ross to make similarly large and/or unwise bets—yet using Stake Cash they purchased themselves.

   *4.  Stake's Terms and Conditions Require Users to Waive Certain Rights*

81.     One recent version of Section 26 of Stake.us's Terms and Conditions imposes on all users, including Plaintiffs and the Class, a contract of adhesion mandating that all disputes be referred to arbitration and that users waive their right to sue in open court.

---

[4]     https://www.gamblingcommission.gov/uk/public-and-players/guide/return-to-player-how-much-gambling    -machines-payout.

82.     The Terms and Conditions impose other requirements, such as purporting to waive any right to challenge the American Arbitration Association's competence, authority, or jurisdiction to hear the matter; requiring that the arbitration be held virtually; limiting depositions to one per party unless Stake consents to more; waiving a hearing if neither party's claims exceed $25,000; and mandating strict confidentiality.  All of these terms are void because any version of the Terms and Conditions purports to create a contract to engage in an illegal act: illegal gambling inside or outside the Commonwealth.

83.     Stake.us's Terms and Conditions require users to waive the right to any form of collective, consolidated, or class action.

84.     Such Terms and Conditions are contrary to public policy, represent an attempt to make a contract for an illegal purpose, and were procured through Stake.us's deception of Plaintiffs into creating accounts based on representations that the site offered a safe and free gambling experience, and based on Drake's endorsement and advertisement of the platform.

### 5.  Consumer Harms from the Illegal Gambling Operation

85.     Stake.us generates revenue from unwitting, and often vulnerable, American consumers—incentivizing Stake.us to continually deceive American consumers and regulators.

86.     Such misrepresentations that Stake.us is not a casino when in fact it functions as one prey on consumers, particularly those who are prone to gambling addiction.

87.     By masking its real money gambling platform as a free and safe "social casino," Stake and Defendants create a predatorial gambling environment, deliberately misleading consumers and exposing consumers to the risks of gambling addiction and jeopardizing the financial well-being of consumers and their families.

88.     Plaintiffs signed up for Stake accounts in reliance on Drake's endorsement of Stake.us and after seeing his promotional content depicting Stake.us as a legitimate platform.

Drake's celebrity status, combined with his personal participation in gambling on the platform during livestreams, led Plaintiffs to believe that Stake.us was a lawful gambling experience when it was not.

89.     Plaintiffs have been damaged by the misrepresentations inherent in Drake's endorsement and advertisement of Stake.

90.     Drake's promotional activities portrayed him as an ordinary user of the platform when, in reality, he uses the platform to tip his co-conspirators and deploy his bot army in furtherance of fraudulent streaming schemes.

91.     Had Plaintiffs known that Defendants, including Drake, utilized the platform to "Tip" co-conspirators and employ their bot army, Plaintiffs would not have signed up for an account or spent money on the platform.

92.     Plaintiffs have been damaged by the false marketing manipulation and abuses of Defendants Drake, Ross, and Nguyen, who participate in the marketing of Stake.

93.     Defendants Drake, Ross, and Nguyen's scheme has caused damage to Plaintiffs, who were manipulated into signing onto and transacting on Stake.us based upon Defendants Drake, Ross, and Nguyen's representations.

**B.     Drake's Illegal "Botting" Scheme and Its Connection to the Illegal Gambling Operation.**

94.     Drake, Ross, and Nguyen have further incentive to promote (and mask the true nature and extent of their conduct on and around) Stake. Since at least 2022, Drake and those acting under his direction—including Ross and Nguyen—have made use of Stake.com and Stake.us to covertly finance the orchestrated procurement of botting and streaming farm activities to artificially inflate the number of plays attributed to Drake's catalogue across major digital streaming services such as Spotify.

17

*1.   The Music Streaming Industry*

95.     Individuals can stream music through music streaming platforms such as Amazon Music, Apple Music, Spotify, and YouTube Music (i.e., the Streaming Platforms). Each time a song is streamed through one of the Streaming Platforms, the songwriter who composed the song, the musician who performed it, and in certain cases other rights holders, are entitled to small royalty payments. The exact amount of the royalty payments owed varies depending on a number of factors, but it is often less than one cent per stream.

96.     The funds used to pay royalties to songwriters, composers, lyricists, and music publishers (the "Songwriters") are obtained from the Streaming Platforms. Generally, the Streaming Platforms are required to pay a certain percentage of their revenues (the "Revenue Pool") to Performance Rights Organizations ("PROs"), for the right to publicly perform songs (known as performance royalties), and to the Mechanical Licensing Collective (the "MLC"),[5] for the right to digitally reproduce and distribute songs (known as digital mechanical royalties). The Streaming Platforms also send data on streaming activity along with the Revenue Pool, which is then used by the PROs and the MLC (collectively, the "Rights Organizations") to proportionally allocate and disperse payments from the Revenue Pool to the Songwriters whose songs were streamed during the same period that the Streaming Platforms earned the revenue. As a result, streaming fraud diverts funds from Songwriters whose songs were legitimately streamed by real consumers to those who use automation to falsely create the appearance of legitimate streaming.

97.     The funds used to pay royalties to performing artists, record companies, or other sound recording distributors ("Artists") are also obtained from the Streaming Platforms. Like

---

[5] The MLC is a nonprofit organization designated by the U.S. Copyright Office pursuant to the Music Modernization Act of 2018, Pub. L. No. 115-264, 132 Stat. 3676 (2018). The MLC collects digital mechanical royalties from the Streaming Platforms and distributes them to the Songwriters.

songwriter royalties, Streaming Platforms are generally required to pay a pool of royalties to Artists for the right to stream the sound recordings that embody musical compositions. This sound recording royalty pool is also often calculated as a certain percentage of Streaming Platform revenues, and the royalty pool is then allocated proportionally among Artists based on their respective percentages of total streams. These allocated royalty funds are then paid directly by Streaming Platforms to Artists (through the record companies and music distribution companies). Streaming fraud thus diverts sound recording royalties away from Artists whose sound recordings were legitimately streamed by real consumers, in the same way that streaming fraud diverts musical composition royalties away from Songwriters.

       2.   *Streaming Fraud is Prohibited by the Streaming Platforms, Music Distribution Companies, an Rights Organizations*

98.    Streaming Platforms generally prohibit streaming manipulation in their terms of service. Like music distribution companies, which facilitate the distribution of artists' music to the Streaming Platforms, also prohibit streaming fraud. The Rights Organizations generally prohibit streaming manipulation. Indeed, the mission of the MLC is to ensure that Songwriters receive their mechanical royalties from streaming and download services accurately.[6]

99.    Such activity constitutes "streaming fraud," whereby music streams are artificially and fraudulently increased to increase the revenue share for the Rights holders of those artists, thereby capturing ill-gotten music royalties that would otherwise be owed to other Rights holders whose own revenue shares have been diminished by the fraud.

100.    Often times, streaming fraud is carried out by deploying "Bots," which are automated software programs that run scripts to perform repetitive tasks on the internet at high

---

[6] The federal regulations that govern the MLC's distribution of digital mechanical royalties provide that manipulated streams are not eligible for royalties. *See* 37 C.F.R. §§ 385.2, 385.21.

speeds. In the context of streaming fraud, large numbers of Bots are programmed to repeatedly and continuously stream certain songs, thereby fraudulently inflating the total number of streams for that music. These Bots are often purchased, deployed, or coordinated by third parties for the purpose of manipulating streaming metrics. The use of such Bots creates the false appearance of heightened popularity for specific artists or recordings and inflates the total number of reported streams on the platform.

101.    Often times, those engaged in streaming fraud employ "Bot Vendors" who are specialized tech and software companies that build and deploy Bots on the internet.

102.    Bot Vendors typically design Bots to mimic human behavior and resemble real social media or streaming accounts in order to avoid detection. Bot Vendors also use Virtual Private Networks (hereinafter "VPNs") which are encrypted internet connections that protect privacy and data, in part, by obscuring the physical location of the internet user. Through a series of technical devices, Bot Vendors use VPNs to obscure the true location of the Bot Accounts, making it appear as though the Bots are streaming music from all over the world, when in reality the Bot Accounts all originate from a small number of locations (in some cases a singular location), and from areas that lack the population to support a high volume of streams.

103.    There is no limit to the number of Bots that can be deployed, particularly on Spotify whose platform does not require a credit card to establish an account. Bot Vendors can utilize thousands, and in some cases, many more Bots at any one time.

104.    The use of Bots is supposedly prohibited on all major music platforms, including Spotify, as they can result in a distortion of those services' finite revenue pools, and in so doing, distort the revenue shares owed to artists and Rights holders whose music is being streamed by legitimate users.

### 3. Defendants' Music Streaming Manipulation Scheme

105.    The music streaming fraud proceeded in three stages. First, upon information and belief, Drake and Ross used their illegal gambling proceeds to pay Nguyen and bot vendors to create thousands of accounts on the Streaming Platforms (the "Bot Accounts") that they could use to stream songs. Second, Nguyen and others used software to cause the Bot Accounts to continuously stream Drake's songs. Third, Drake collected royalties based on the fraudulent streams by the Bot Accounts.

**Phase 1: Drake and Ross Funnel Their Illegal Gambling Proceeds to Nguyen and Others through Stake's Anonymous Tipping Feature**

106.    Drake and Ross knew that Streaming Platforms would shut down any Bot Accounts if they learned that they were fraudulently streaming Drake's music. Drake and Ross therefore took steps to conceal their scheme and to evade the Streaming Platform's fraud detection and prevention systems.

107.    Upon information and belief, Drake and Ross exchanged millions of dollars between themselves and others through various means including unregulated "tips" on Stake.com and the exchange of high-value gifts.

108.    Stake.com offers a user-to-user "Tipping" program—an unlimited and wholly unregulated money transmitter that appears to exist outside the oversight of any financial regulator.

109.    The Tipping feature and internal transfer mechanisms effectively obscure the identities of counterparties, mask withdrawals as generic transactions, and stymie scrutiny and tracing of illicit proceeds.

110.    Through the tipping mechanism, withdrawals are recorded merely as Stake transactions, concealing their true origins and recipients. These transactional features enable the concealment, covert routing, and disbursement of funds to bot operators, intermediaries, and

21

amplifiers integral to sustaining and expanding the artificial streaming and amplification operations.

111.    Upon information and belief, Drake, Ross, and Nguyen used VPNs to access Stake.com, which in turn gave them access to Stake.com's tipping program.

112.    Drake and Ross used the tipping feature to send each other high dollar amount (well above U.S. Currency Transaction Report thresholds) "Tips" during live streams.

113.    For example, on or around November 10, 2023, for example, Ross livestreamed himself on Kick "Tipping" $100,000 to Drake through Stake, telling him to use the money for gambling.[7]

114.    On or around October 8, 2024, Ross again livestreamed himself on Kick "Tipping" $11,000 to Drake through Stake.

115.    Drake and Ross' high-value exchanges were not limited to Stake, however.

116.    In or around May 2025, Ross gifted Drake a diamond encrusted Nokia cell phone chain estimated to be valued at over $300,000.

117.    In or around November 2025, Drake gifted Ross a $220,000 car.

118.    Upon information and belief, these "gifts" were publicized events sponsored by the Stake defendants to be streamed on Kick to further promote viewership of their channels where Drake and Ross promoted Stake's illegal gambling business.

### Phase 2: Nguyen Orchestrates Clipping Campaigns

119.    Upon information and belief, Drake and Ross sent intermediary transfers to bot vendors and logistics facilitators, including Nguyen—a known recipient of payments linked to clipping and amplification campaigns.

---

[7]  https://www.essentiallysports.com/esports-news-adin-ross-tips-drake-with-hundred-grand-after-winning-millions-while-gambling/

120.    Nguyen, known in online forums as "Grand Wizard," "Grand Wizard Chat N***a," or "Grand Wizard CN" functioned, and appears to continue to function, as a broker and operational facilitator for "botting" schemes used to perpetuate and scale streaming manipulation activities.

121.    Upon information and belief, Nguyen is a video content "clipper" who edits internet content creators. Ross has publicly stated that he is "friends" with Nguyen, who in turn has claimed to edit Ross' videos.

122.    Upon information and belief, Nguyen is also acquainted with Drake. Leaked messages from Nguyen's Instagram account reflect that he and Drake frequently communicated with each other.

123.    Nguyen is part of a "Clipping" community on the social media platform Discord that connects content creators with content editors who are compensated for cutting, editing, posting, and tracking viral video clips across social media. Compensation for clippers is typically based on performance, with payment tied to engagement metrics, such as view counts.

124.    Nguyen's Discord clipping community orchestrated paid "clipping" campaigns intrinsically tied to streaming numbers and influencer content, including campaigns involving Drake and Ross.

125.    Nguyen actively promoted and participated in these campaigns, receiving direct payments both from the Discord's administrators and other co-conspirators.

126.    Nguyen paid Bot Accounts to artificially inflate views on his clipping campaigns.

### Phase 3: Bots Inflate Drake's Streaming

127.    On information and belief, a substantial percentage of Drakes's Spotify streams between January 2022 and September 2025 were inauthentic and appeared to be the work of a sprawling network of Bot Accounts.

128.    On information and belief, Drake's music streams reflect abnormal VPN usage, seemingly designed to obscure the true geographic origins of the Bot Accounts that were streaming his songs. For example, Plaintiff is informed and believes that over a four-day period in 2024, at least 250,000 streams of Drake's song "No Face" originated in Turkey, but were falsely geomapped through the coordinated use of VPNs to the United Kingdom in attempt to obscure their origins.

129.    On information and belief, a large percentage of the accounts streaming Drake's music were geographically concentrated around areas whose populations could not support the volume of streams emanating therefrom. In some cases, massive amounts of music streams, more than a hundred million streams, originated in areas with zero residential addresses.

130.    On information and belief, Geohash data shows that nearly 10% of Drake's streams come from users whose location data showed that they traveled a minimum of 15,000 kilometers in a month, moved unreasonable locations between songs (consecutive plays separated by mere seconds but spanning thousands of kilometers), including more than 500 kilometers between songs (roughly the distance from New York City to Pittsburgh).

131.    On information and belief, between January 2022 and September 2025, the volume and timing of the music streams for Drake's music failed to follow typical, established streaming patterns. While most songs and/or albums see an initial spike in streaming immediately upon release, those same songs/albums typically follow a predictable decay pattern over the following months. However, in many instances, the streams of Drake's music on Spotify saw significant and irregular uptick months—and in some cases years—after the release of his songs, with no reasonable explanations for those upticks other than streaming fraud. In other instances, Drake's decay rate was slower and less dramatic when compared to those of his contemporaries.

132.   Additionally, the number of streams of Drake's music attributable to individual accounts is staggering and irregular. For instance, on information and belief, while the average Spotify listener listens to 10 songs per day, a massive amount of the accounts listening to Drake's music (Drake's "users") listened exclusively to Drake's music for 23 hours a day.

133.   On information and belief, less than 2% of Drake's listeners on Spotify account for roughly 15% of his overall streams. And roughly 9% of his streams are attributable to less than 1% of his users. As a result, Drake's music accumulated far higher total streams compared to other highly-streamed artists, even though those artists had far more "users" than Drake.

134.   As a result of the fraudulent streaming scheme described above, with respect to Drake's music, the Rights holders of Drake's music (Drake and his company, Frozen Moments, LLC) saw their shares of the revenue pool substantially and artificially increased. This generated significant revenues for Drake and Frozen Moments, LLC, all at the expense of other Rights holders whose shares and revenues were greatly diminished.

135.   The amount of streaming revenue that would otherwise have been distributed to legitimate Rights holders but for the fraudulent boosting of Drake's music is estimated to be in the hundreds of millions of dollars.

## CLASS ACTION ALLEGATIONS

136.   Plaintiffs bring this action individually and on behalf of a class of similarly situated individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.

137.   Plaintiffs seek to represent the following classes or persons:

All persons in the United States who created an account on or accessed Stake.us and who purchased Gold Coins bundled with Stake Cash and made and lost one or more wagers using Stake Cash within the last three years.

138.   In the alternative, Plaintiffs seek to represent the following classes or persons:

> All persons in Virginia who created an account on or accessed Stake.us and who purchased Gold Coins bundled with Stake Cash and made and lost one or more wagers using Stake Cash within the last three years.

139.    Excluded from the Class are Defendants, their officers, directors, and affiliates, and any judicial officer assigned to this matter and their immediate families.

140.    Plaintiffs reserve the right to further amend or modify the Class definition in connection with their motion for class certification, as a result of discovery, at trial, or as otherwise allowed by law.

141.    Plaintiffs bring this action individually and on behalf of all others similarly situated because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

### A.    Numerosity

142.    The potential members of the Class, and each of the sub-classes independently, are so numerous that joinder of all the members is impracticable. While the precise number of members of the Class, or each of the sub-classes, has not been determined, Plaintiffs are informed and believe the Class, and each of the sub-classes, includes at least thousands of individuals.

143.    Based on information and belief, Stake.us online records will evidence the number and identity of Class members.

### B.    Commonality and Predominance

144.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

> (a) Whether Defendants engaged in unfair or deceptive business practices by making the misrepresentations and omissions as described herein;

26

(b) Whether Stake.us constitutes an illegal gambling platform in violation of United States and Virginia law;

(c) Whether Defendants' conduct constitutes predicate acts of monetary transactions in criminally derived property, or other racketeering activity under RICO and the relevant statutory schemes;

(d) Whether Defendants were unjustly enriched by proceeds routed through the coordinated scheme;

(e) Whether liability and damages can be established with common proof through platform data, financial tracing, and expert analysis; and

(f) Whether injunctive, declaratory, or other class wide relief is necessary and appropriate to prevent recurrence of the described conduct.

## C.     Typicality

145.    The claims of Plaintiffs are typical of the claims of the Class. Plaintiffs and all members of the Class sustained injuries and damages arising out of, and caused by, the same common course of conduct in violation of law.

## D.     Adequacy of Representation

146.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Counsel who represents Plaintiffs are competent and experienced in litigating large consumer class actions.

## E.     Superiority of Class Action

147.    A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only

individual Class members. Each member of the Class has been damaged and is entitled to recovery because of Defendants' unlawful actions and/or practices described herein. There are no individualized factual or legal issues for the Court to resolve that would prevent this case from proceeding as a class action. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

### Violation of RICO 18 U.S.C. § 1962(c)
### Participation in an Unlawful Enterprise Through a Pattern of Racketeering Activity
### (Against All Defendants)

148.    Plaintiffs reallege the preceding Paragraphs as if alleged herein.

149.    Plaintiffs' right to bring class-based RICO claims constitutes a statutory and unwaivable remedy.

150.    Defendants are all persons within the meaning of 18 U.S.C. § 1961(3).

151.    The Enterprise: Defendants, together with bot vendors, streaming-farm operators, and other facilitators known and unknown, associated to form an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

152.    Common Purpose: The Enterprise's common purpose was to enrich the Defendants at Plaintiffs' expense through an illegal online gambling and streaming manipulation operation. Defendants promoted the illegal gambling operation and used proceeds from the operation to pay for services that artificially inflated streaming counts for Drake's catalog. Drake, in turn, leveraged his elevated status generated from such artificial streams to further promote the illegal gambling operation.

153.   <u>Continuity</u>: The Enterprise has operated as a continuous, coordinated unit since at least 2022 and remains an ongoing and imminent threat of racketeering activity. The Enterprise is defined by explicit roles:

    a.   Stake.us is an illegal online casino founded by Craven and Tehrani in 2022, earning profit by selling consumers Gold Coins and Stake Cash;

    b.   Stake.com served as a transactional infrastructure for routing, concealing, and distributing funds via Tipping;

    c.   Kick is a streaming platform founded by Craven and Tehrani in 2022 to promote Stake's illegal gambling business;

    d.   Drake has been a paid promoter and spokesperson for Stake since 2022, and financed, directed and reaped the benefits of streaming and social media manipulation;

    e.   Ross has also been a paid promoter for Stake since 2022, and amplified Stake.us as a casino and covert payment conduit;

    f.   Upon information and belief, Nguyen has also been a paid promoter for Stake since 2022, and received money through Stake to broker, coordinate, and operate through bot vendors and clipping channels to artificially boost Drake's streams.

154.   <u>Relationships & Participation in Management/Operation of Enterprise</u>: Each Defendant held a related in the management operation of the enterprise that funneled illegal gambling proceeds to illegal bots that artificially boosted Drake's streams and deceived streaming platforms:

a.  Stake at all times served as a gambling platform and money transfer conduit through which payments could be concealed. Stake further paid influential individual including Drake and Ross to promote Stake.us as legal and safe;

b.  Kick partnered with high profile streamers like Drake and Ross to promote Stake through their livestreams on Kick;

c.  Drake promoted Stake on Kick and made and received payments through Stake, and directed and benefited from artificial streaming and narrative amplification;

d.  Ross promoted Stake on Kick and financed, promoted, and facilitated the routing of value—including via public and private "tipping" and large-value transfers on Stake—while coordinating amplification with Nguyen; and

e.  Upon information and belief, Nguyen further promoted Stake, sent and received payments through its Tipping system, and brokered and interfaced with bot vendors and paid amplification pipelines (including through Weekdays/Weekdays Capital and the Clipping service).

155.  <u>Effect on Interstate Commerce</u>: The Enterprise engaged in and affected interstate and foreign commerce through the use of nationally accessible platforms, interstate wires, and cross-border payment and settlement networks.

156.  <u>Pattern of Racketeering:</u> In furtherance of their multi-year schemes, Defendants committed at least two related racketeering acts proscribed by 18 U.S.C. 1961(1) between 2022 and the present that were otherwise indictable under various provisions of State and Federal Law, including Section 1962(c), thus constituting a pattern of racketeering activity. These predicate acts include, but are not limited to:

a. *Operation of Illegal Gambling Business/Enterprise.* All Defendants operated, conducted, financed, managed, supervised, director, or owned an illegal gambling enterprise in violation of 18 U.S.C. § 1955, Va. Code Ann. § 18.2-328, and numerous other state statutes:

    i. The Stake Defendants own and operates the Stake gambling platform.

    ii. Defendants Drake, Ross, and, upon information and belief, Nguyen each agreed to promote Stake through advertisements and live streaming their own use of Stake's illegal platform on Kick.

b. *Wire Fraud (Misrepresentation of Legality).* From at least 2022 through 2025, all Defendants knowingly (i) devised a scheme and artifice to defraud Plaintiffs and other consumers by means of false and fraudulent pretenses regarding the Stake illegal gambling platform, and (ii) used interstate wire communications to facilitate that scheme and artifice in violation of 18 U.S.C. § 1343:

    i. Defendant stake.us (a) holds itself out in its Terms and Conditions, which are available online, as a platform that does "not offer real money gambling" and claims that "no purchase or payment is necessary to participate or play [Stake.us] games;" (b) proclaims that it provides "the ultimate social, safe and free gaming experience" on its homepage; (c) characterizes itself as a "Social Casino," or "an online platform that offers casino-style games for entertainment purposes, without involving real money;" fails to list Virginia among the states where its use is prohibited, thus leaving the impression that using Stake is permissible in Virginia.

ii. Defendants Drake, Ross, and, upon information and belief, Nguyen similarly promoted Stake on their social media platforms and live streams as a safe and legal means of gambling.

Plaintiffs purchased and wagered Gold Coins or Stake Cash, or some combination of both, on the casino games, in reliance on these statements and the illusion they created that gambling on Stake was legal. Plaintiffs would not have done so but for Defendants' actions.

c. *Wire Fraud (Streaming Manipulation).*    From at least 2022 through 2025, Defendant Drake knowingly devised a scheme and artifice to defraud the Streaming Platforms by obtaining money by means of false and fraudulent pretenses. Upon information and belief, Drake knowingly used interstate wires to further that scheme, including by (but not limited to) (i) agreeing to abide by the terms and conditions of Streaming Platforms prohibiting streaming manipulation, and (ii) transmitting funds to Ross and, upon information and belief, Nguyen to procure Bot Accounts to effectuate the streaming manipulation. As a result of these actions, The Streaming Platforms paid Drake millions of dollars that they otherwise would not have paid. Such actions violate 18 U.S.C. § 1343.

d. *Wire Fraud/Money Laundering.* From at least 2022 through 2025, Defendants Drake, Ross, and, upon information and belief, Nguyen conducted financial transactions knowing that those transactions represented the proceeds of their illegal gambling enterprise (a) with the intent to promote the carrying on the streaming manipulation wire fraud, and (b) knowing that the transactions were designed to conceal or disguise the nature, location, source, ownership, or control

of the proceeds of the illegal gambling enterprise, in violation of 18 U.S.C. §§ 1343, 1956, 1957.

157.    <u>Continuity and Pattern.</u>  These racketeering acts were related and sustained for a period of four or more years. They were not isolated incidents and pose a threat of and actual systematic, continuous criminal activity on the part of all of the Defendants, who often collected together to engage in these acts. The Enterprise and activities began no later than 2022 and continued through the present, demonstrating closed-ended and open-ended continuity.

158.    <u>Injury to Business or Property</u>.  Plaintiffs have suffered substantial injuries to their property due to Defendants' racketeering activities.

   a.   *Financial Harm.* Plaintiffs suffered financial losses for the amount they paid stake.us for Gold Coins or Stake Cash, as well as the money lost on that gambling.

   b.   *Connection to Enterprise/Pattern of Racketeering.*  The illegal gambling business and the wire frauds Defendants perpetrated to bring business to the illegal gambling business articulated in paragraph 158(a)-(b) proximately caused Plaintiffs' damages in an amount to be determined at trial, but expected to be in excess of $5,000,000, plus treble damages, costs, and attorney's fees.

159.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class seek treble damages, costs, and reasonable attorneys' fees.

**COUNT II**

**RICO Conspiracy, 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

160.    Plaintiffs reallege the preceding Paragraphs as if alleged herein.

161.    Defendants knowingly agreed and conspired that one or more of them would conduct or participate in the Enterprise's affairs through a pattern of racketeering activity.

162.    Overt acts in furtherance include dissemination of coordinated narratives and the routing and concealment of payments between Defendants via Stake.com "tipping" and internal transfers.

163.    Plaintiffs and the Class suffered injury by reason of Defendants' § 1962(d) violation and seek treble damages, costs, and fees under 18 U.S.C. § 1964(c).

<u>**COUNT III**</u>

**Virginia Consumer Protection Act (VCPA), Va. Code § 59.1-196 et seq.**
**(Against All Defendants)**

164.    Plaintiffs reallege the preceding Paragraphs as if alleged herein.

165.    Defendants engaged in deceptive and misleading acts and practices in connection with consumer transactions affecting Virginia residents, including by misrepresenting the Stake platform as a safe, harmless, and legal platform, when it in fact constitutes an illegal gambling platform.

166.    Defendants engaged in deceptive and misleading acts and practices in connection with consumer transactions affecting Virginia residents, including by misrepresenting Drake's endorsement and advertisement of the platform.

167.    Defendants' conduct constitutes misrepresentations and omissions of material facts, false representations as to characteristics, standard, and qualities of the services consumed, and deception likely to mislead reasonable consumers, in violation of the VCPA.

168.    Plaintiffs and the Class suffered ascertainable losses as a result of Defendants' violations, including overpayments and loss of the benefit of their bargain.

169.    Plaintiffs seek statutory damages, actual damages, treble damages where authorized for willful violations, injunctive relief, attorneys' fees, and costs.

## COUNT IV

**Declaratory Judgment Act, 28 U.S.C. § 2201**
**(Against All Defendants)**

170.    Plaintiffs reallege the preceding Paragraphs as if alleged herein.

171.    An actual and justiciable controversy exists between Plaintiffs and the Class, on the one hand, and Defendants, on the other hand, as to Plaintiffs' rights with respect to challenge Defendants' misconduct via Stake.us, notwithstanding the Stake.us Terms and Conditions that purport to mandate individual arbitration, waiving all class rights, as the exclusive forum for dispute resolution between the parties.

172.    Specifically, a recently reviewed version of Section 26 of Stake.us's Terms and Conditions imposes on all users, including Plaintiffs and the Class, a contract of adhesion, mandating that all disputes be referred to arbitration and that users waive their right to sue in open court.  The Terms and Conditions impose other requirements for Stake's convenience as well, such as purporting to waive any right to challenge the American Arbitration Association's competence, authority, or jurisdiction to hear the matter; requiring that the arbitration be held virtually; limiting depositions to one per party unless Stake consents to more; waiving a hearing if neither party's claims exceed $25,000; and mandating strict confidentiality.

173.    Further, Stake.us's Terms and Conditions require users to waive the right to any form of collective, consolidated, or class action.

174.    Defendants are expected to argue in this action that the Terms and Conditions require dismissal of any class claims and/or referral to arbitration.   Indeed, Defendants have already relied on the Terms and Conditions to argue as much to Plaintiffs, in their February 3, 2026 demand letter, confirming Defendants' position that the Terms and Conditions bar this action.

175.   Plaintiffs contend that the Terms and Conditions are not enforceable to bar their claims, because Plaintiffs cannot validly waive their right to bring class-based RICO claims.

176.   Plaintiffs also contend that the Terms and Conditions, including as to the mandatory arbitration clause and class waiver, are not enforceable to bar their claims, because the Terms and Conditions are contrary to public policy and were procured by fraud.

177.   Plaintiffs further contend that the Terms and Conditions are an attempt to contract for an illegal activity in the Commonwealth in violation of Va. Code 18.2 § 325 as well as Virginia's long-established common law, which renders that contract and its terms void and unenforceable.

178.   Plaintiffs and the Class, and Defendants, are directly adverse to one another on this issue, and the matter is fully ripe for adjudication.  The parties' dispute is ongoing and concrete. Indeed, the controversy goes directly to the threshold question of whether the parties' dispute may be heard by this Court, or must instead be relegated to confidential arbitration on Stake's terms.

179.   The Court independently possesses jurisdiction over the parties based on diversity jurisdiction under 28 U.S.C. § 1332(d)(2), as well as federal question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), given Plaintiffs' and the Class' RICO claims; supplemental jurisdiction over Plaintiffs' related state-law claims exists per 28 U.S.C. § 1367(a).

180.   Granting declaratory relief as requested by Plaintiffs will usefully clarify the parties' rights and relieve the current uncertainty as to whether Plaintiffs and the Class are entitled to bring claims in court against Defendants, as they have done in this action.

181.   Plaintiffs also lack an adequate remedy at law.  Absent this Court's declaratory relief, Plaintiffs and the Class will remain subject to Stake's claimed right to refer all users' disputes and claims against it to confidential, atomized arbitrations favorable to Stake.

182.    As such, good cause exists for the Court to exercise its discretion to grant declaratory relief.

183.    Plaintiffs seek a declaratory judgment from this Court affirming and holding that the mandatory arbitration and class waiver terms in Stake.us's Terms and Conditions are void and unenforceable.

## **PRAYER FOR RELIEF**

184.    WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor and against Defendants and award the following relief:

  a.  Certifying this action as a class action pursuant to Fed. R. Civ, P. 23(a), 23(b)(2), and/or 23(b)(3); appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel; and directing appropriate notice to the Class;

  b.  Awarding all available damages, not less than $5,000,000, including statutory, compensatory, consequential, punitive, and enhanced damages and attorneys' fees where authorized by law (including under 18 U.S.C. § 1964(c) and the VCPA);

  c.  Ordering restitution and disgorgement of amounts wrongfully obtained by Defendants;

  d.  Entering injunctive and declaratory relief to prevent further unlawful conduct, including but not limited to a declaratory judgment holding that the mandatory arbitration and class waiver terms in Stake.us's Terms and Conditions are unenforceable;

  e.  Awarding pre- and post-judgment interest, attorneys' fees, and costs as permitted by law; and

    f.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Respectfully Submitted,

Plaintiffs By Counsel


IMPRESA LEGAL GROUP

 */s/ George E. Kostel*
George E. Kostel, Esq. (VSB # 34757)
Richard K. Kelsey, Esq. (VSB # 44232)
Impresa Legal Group
3101 Wilson Blvd., Suite 500
Arlington, VA 22201
Tel: (703) 842-0660
Fax : 703-243-8696
Email: georgekostel@impresalegal.com
Email:  richkelsey@impresalegal.com


LAW OFFICES OF KIMBERLY HINKLE


 /s/ Kimberly D. Hinkle
Kimberly D. Hinkle (Bar No. 20936) (admitted *pro hac vice*)
13920 N Western Avenue
Edmond, OK 73013
Tel: (405) 639-8150
Email:  kim@khinklelaw.com

*Counsel for Plaintiffs*