IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| LASHAWNNA RIDLEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:25-cv-2511 (LMB) |
| | ) | |
| SWEEPSTEAKS LTD., et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION</u>

Before the Court is plaintiffs LaShawnna Ridley, Regina Ridley, Tiffany Hines, Stephine

Hines, Preddy Ray, Dekeya Adams, Ricola Lawshea, and Latosha Sanderlin's (collectively,

"plaintiffs") second amended four-count putative class action complaint against defendants

Sweepsteaks Ltd., d/b/a Stake.us ("Stake"), Kick Streaming Pty Ltd. ("Kick"), Aubrey Drake

Graham a/k/a Drake ("Drake"), Adin Ross ("Ross"), and George Nguyen ("Nguyen")

(collectively, "defendants"), in which plaintiffs seek various remedies for harm they allegedly

suffered by using the Stake platform. <u>See generally</u>, [Dkt. No. 49].[1] Stake has filed a Motion to

Compel Arbitration and Stay Proceedings ("Motion to Compel Arbitration"), or in the

alternative, a Motion to Dismiss Plaintiffs' First Amended Complaint ("Stake's Motion to

Dismiss"). Also pending are Kick's Motion to Dismiss Plaintiffs' Second Amended Complaint;

Stake and Kick's Motion to Deny Class Certification and Strike Class Allegations in Plaintiffs'

Second Amended Complaint ("Joint Motion to Deny Class Certification"); and Stake's Motion

to Strike Unauthorized Amendments in Plaintiffs' Second Amended Complaint, or in the

Alternative Compel Arbitration or Dismiss Plaintiffs' Second Amended Complaint ("Stake's

---

[1] Based on the Court's docket, it appears that Drake, Ross, and Nguyen have not yet been served.

Motion to Strike Unauthorized Amendments").[2] For the reasons discussed below, Stake's

Motion to Compel Arbitration will be granted, Stake's Motion to Dismiss will be denied as

moot, and all other pending motions will be held in abeyance pending arbitration.

I.

The following facts are taken from the Second Amended Class Action Complaint

(hereinafter, "Second Amended Complaint"), and documents incorporated by reference in the

Second Amended Complaint. See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d

435, 448 (4th Cir. 2011). Stake owns and operates an online platform that allows users to play

casino-style games, such as slots, table games, scratch cards, and live dealer games. [Dkt. No.

49] at ¶ 48. To enter Stake's platform, users must accept Stake's Terms and Conditions

(hereinafter, "Terms"), which have changed somewhat over time. Id. at ¶¶ 97-104; [Dkt. No. 17]

at 2; [Dkt. No. 37] at 4. Specifically, from July 2022 until May 2023, after users provided

information such as their email address, date of birth, username, and password to create an

account, they were prompted with a registration screen "inform[ing] users that by clicking the

'Play Now' button, they indicated that they had read and acknowledged the Terms, which [were]

displayed in bold and hyperlinked to the then-operative Terms." [Dkt. No. 17] at 2. An image of

this registration screen is shown below with a red arrow added by the Court showing where the

acknowledgement was located:

---

[2] The procedural history of this civil action is complicated by the fact that plaintiffs filed a
Second Amended Complaint while defendants' initial motions were still pending. As discussed
below, the Court finds Stake's Motion to Compel Arbitration dispositive. See infra. Although
Stake's Motion to Compel Arbitration was based on plaintiffs' First Amended Complaint, the
Court will apply its arguments to plaintiffs' Second Amended Complaint, especially as the
Second Amended Complaint does not include any new allegations that would substantively alter
the Court's analysis as to this pending motion. See [Dkt. No. 52] at 9 ("Notwithstanding
Plaintiffs' [Second Amended Complaint], Stake[] . . . maintains that this Court should grant its
pending Motion to Compel Arbitration for the reasons stated in its accompanying submissions.").



Id. at 3.

In May 2023 and as of the present, Stake changed the screen which now "presents users with the Terms in a scroll window directly on the registration screen." Id. Under this configuration, "[b]efore a user can complete the registration process, the [p]latform requires the user to (a) scroll through the Terms in their entirety and (b) check a box next to the statement: 'I have read and agree to the Terms and Conditions.'" Id. "Only after the user both scrolls to the end of the Terms and checks the box can the user click the 'Create an Account' button." Id. In fact, "[i]f a user attempts to click 'Create an Account' before completing these steps, the [p]latform displays the following statement in red text: 'Plead read the terms and conditions in

full and scroll to the end to accept.'" Id. An image of this screen is shown below, again with a

red arrow added by the Court showing the relevant language:



Id. at 4.

Stake periodically updates its Terms. When these updates occur, users are required to

accept the updated terms to continue accessing Stake's platform Id. at 5-6. Beginning May 15,

2023, the Stake platform "displayed a mandatory acceptance window to all users who had not yet

accepted an updated version of the Terms[,]" and "required the user to scroll through them in

their entirety before clicking a checkbox indicating agreement to the updated Terms." Id. In

August 2025, the Stake platform "again displayed a mandatory acceptance window to all users who had not accepted the then-current version of the Terms." Id.

As shown in the previous screen, Stake's Terms as of December 30, 2025[3], make clear that they contain a binding arbitration agreement. First, before the Terms even begin, they state:

> IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION AND A WAIVER OF CLASS ACTION RIGHTS AS DETAILED IN CLAUSE 26.

[Dkt. No. 17-16] at 2 (capitals in original).

Section 2.6 of the Terms reinforces this warning, stating:

> PLEASE BE AWARE THAT THESE TERMS INCLUDE DISPUTE RESOLUTION PROVISIONS, INCLUDING A PROVISION WAIVING YOUR RIGHT TO PURSUE ANY CLASS, GROUP OR REPRESENTATIVE CLAIM AND REQUIRING YOU TO PURSUE PAST, PENDING, AND FUTURE DISPUTES BETWEEN YOU AND US THROUGH INDIVIDUAL ARBITRATION UNLESS YOU OPT OUT WITHIN THE SPECIFIED TIME FRAME PURSUANT TO CLAUSE 26.

Id. at § 2.6 (capitals in original).

The Terms' arbitration clause, Section 26, delegates exclusive authority to the arbitrator, stating:

> [B]oth you and Stake agree that any and all Disputes, including without limitation any question regarding the existence, validity, enforceability, or termination of these Terms and/or this clause 26 . . . as well as the decision of whether the Dispute should be arbitrated in the first place, shall be referred to and finally resolved by arbitration administered by the American Arbitration Association (AAA).

Id. at § 26.6(a).

The arbitration clause further provides:

---

[3] Stake asserts that although there are previous versions of Terms and Conditions, "[Stake's] Terms have always contained materially identical arbitration provisions for purposes of this Motion." [Dkt. No. 17] at 6 n.5.

> 26.3 By agreeing to these Terms, you agree that any and all past, present and future disputes, claims or causes of action between you and Stake or any of its affiliates, subsidiaries, ultimate parent and parent companies, partners, officers, directors, employees, contractors, shareholders, agents, licensors, subcontractors or suppliers, which arise out of or are related in any way to these Terms, the formation of these Terms, the validity or scope of this clause 26 . . . , your Participation in or other access to or use of the Games or the Platform, or any other dispute between you and Stake . . ., including as to the arbitrability of any of the foregoing, and whether arising prior to or after your agreement to this clause 26 (Dispute Resolution and Agreement to Arbitrate) . . . will be governed by the procedure set out below.

> Id. at § 26.3.[4]

The arbitration clause, which is governed under the Federal Arbitration Act, also requires that all arbitrations "proceed in an individual capacity only," and prohibits both users and Stake from bringing a dispute as a collective action. Id. at §§ 26.2, 26.7(a). The Terms define "collective action" broadly to encompass "any claim, action, or proceeding asserted or pursued as a class action, group action, collective action, joint action, coordinated action, consolidated action, mass action, or in any other representative or private attorney general capacity, whether in arbitration, court or any other venue." Id. at § 3(a). The arbitration clause provides that users have the right to opt out:

> You have the right to opt-out and not be bound by the arbitration and class action waiver provisions in this clause 26 (Dispute Resolution and Agreement to Arbitrate) by sending written notice, signed by you, of your decision to opt-out to the following address: Sweepsteaks Limited Att: Sweepsteaks Limited. 1717 Pennsylvania Ave, NW Suite 650, Washington, DC 20006. The notice must be sent within 30 days of creation of your Customer Account[,] . . . otherwise you shall be bound to arbitrate disputes in accordance with these Terms. If you opt-out of these arbitration provisions, Stake will also not be bound by them. If you do not opt out of this clause 26 . . . within the specified time period, you will be deemed to have accepted the arbitration and class action waiver provisions.

> Id. at § 26.9.

---

[4] "**Participate**," "**Participating**," or "**Participation**" are defined in the Terms to mean "playing any Games or using Stake's Platform in any manner whatsoever." [Dkt. No. 17-16] at § 3(g) (bolding in original).

Stake "has no record showing that any of the [p]laintiffs opted out" through the requisite procedures, and plaintiffs do not assert that they have opted out of the arbitration clause. See [Dkt. No. 17] at 8.

Lastly, the Terms include a unilateral modification clause which states:

> Stake reserves the right to amend these Terms, or to implement or amend any procedures, at any time. Any amendments will be published on the Platform and such changes will be binding and effectively immediately. If you do not agree to the amended Terms, you must stop using the Platform.

[Dkt. No. 17-16] at § 28.2.

II.

Plaintiffs LaShawnna Ridley and Tiffany Hines filed the original Class Action Complaint on December 31, 2025, see generally, [Dkt. No. 1]; and filed a First Amended Complaint ("First Amended Complaint") on February 24, 2026, adding six additional named plaintiffs. See generally, [Dkt. No. 9]. On May 6, 2026, Stake filed its Motion to Compel Arbitration, and in the alternative, a Motion to Dismiss. Kick filed a Motion to Dismiss Plaintiffs' First Amended Complaint ("Kick's Motion to Dismiss"). Stake and Kick filed a Joint Motion to Strike Plaintiffs' Class Allegations. After hearing oral arguments on these motions, the Court granted Kick's Motion to Dismiss and dismissed all claims in plaintiffs' First Amended Complaint as to Kick without prejudice to plaintiffs' ability to "refile one last amended complaint." See generally, [Dkt. No. 47].

On June 26, 2026, plaintiffs timely filed their Second Amended Class Action Complaint (hereinafter, "Second Amended Complaint"), now the operative complaint in this civil action. See generally, [Dkt. No. 49]. On July 10, 2026, Kick filed a renewed Motion to Dismiss Plaintiffs' Second Amended Complaint ("Kick's Renewed Motion to Dismiss"); Stake filed a

7

Motion to Strike Unauthorized Amendments; and Stake and Kick filed a renewed Joint Motion to Deny Class Certification.

The Second Amended Complaint alleges that Stake, along with defendants Kick, Drake, Ross, and Nguyen, is responsible for: (1) misrepresenting Stake as a "lawful and safe gambling experience," and (2) concealing that plaintiffs' use of the Stake platform indirectly financed a "bot army" to artificially inflate Drake's popularity on music streaming platforms. [Dkt. No. 49] at ¶¶ 14-15. Plaintiffs contend they "signed up for Stake accounts in reliance on Drake's endorsement of Stake[] and after seeing his promotional content . . . depicting Stake[] as a legitimate platform[,]" and that they were manipulated into signing up and transacting on Stake based on Ross and Nguyen's representations. Id. at ¶¶ 14, 114. They claim that if they had known that Stake was an illegal "gambling" platform that funded the allegedly fraudulent streaming of Drake's music, they would not have signed up for and spent money on the platform. Id. at ¶¶ 9, 24-26. They seek to recover the money they spent and lost "chasing gambling wins." Id. at ¶ 9. Plaintiffs purport to represent a putative nationwide class of "[a]ll persons in the United States who created an account on or accessed Stake[] and who purchased Gold Coins bundled with Stake Cash and made and lost one or more wagers using Stake Cash within the last three years."[5] Id. at ¶¶ 158-59. In the alternative, plaintiffs purport to represent the same class limited to Virginians. Id. at ¶ 160.

---

[5] Stake offers users two types of virtual currency: Gold Coins and Stake Cash. [Dkt. No. 49] at ¶ 51. Gold Coins "do not have monetary value and are described by Stake as solely for entertainment purposes[,]" while Stake Cash "can be cashed out at a one-to-one exchange rate for US dollars[.]" Id. Stake users can buy Gold Coins or earn them through various promotions. Id. at ¶ 52. Users cannot purchase Stake Cash, see [Dkt. No. 19] at 2; however, with each purchase of Gold Coins, Stake "bundles a set quantity of Stake Cash[.]" [Dkt. No. 49] at ¶ 52. Stake users may bet Stake Cash on its various online casino games "with the prospect of a large payout[.]" Id. at ¶ 53.

The Second Amended Complaint asserts four claims against all defendants: (1) violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) RICO conspiracy, 18 U.S.C. § 1962(d); (3) violation of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-196 et seq.; and (4) a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, which seeks a court order declaring "void and unenforceable" the mandatory arbitration and class action waiver provisions in Stake's Terms and Conditions. Id. at ¶¶ 170-208. For the reasons that follow, Stake's Motion to Compel Arbitration will be granted; Stake's Motion to Dismiss will be denied as moot; and all of defendants' remaining motions will be held in abeyance pending the outcome of the arbitration proceeding.

III.

"'The [Federal Arbitration Act ("FAA")] reflects a liberal federal policy favoring arbitration agreements.'" Cole v. Xerox Corp., No. 2:24CV578, 2025 WL 2105360, at *3 (E.D. Va. July 7, 2025), aff'd, No. 25-1842, 2025 WL 3707801 (4th Cir. Dec. 22, 2025) (quoting Adkins v. Labor Ready, Inc., 303 F.3d 496, 500 (4th Cir. 2002)). "Under the [FAA], 9 U.S.C. § 1 et seq. any party bound to an arbitration agreement that falls within the scope of the FAA may bring a motion in federal district court to compel arbitration and stay the proceeding pending resolution of the arbitration." Boyle v. Sweepsteaks Ltd., No. 8:25-CV-00302-JVS-ADS, 2025 WL 1674480, at *2 (C.D. Cal. May 19, 2025) (citing 9 U.S.C. §§ 3-4). "The FAA eliminates district court discretion and requires a court to compel arbitration of issues covered by the arbitration agreement." Id. (citing KPMG LLP v. Cocchi, 565 U.S. 18, 21 (2011)). "The FAA limits the district court's role to determining whether a valid agreement to arbitrate exists and whether the agreement encompasses the disputes at issue." Id. (citing Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1017 (9th Cir. 2016)). "If so, the court must compel arbitration." Id.; see

also Dixon v. Sweepsteaks Ltd., No. 3:25-cv-09641-SAL, Dkt. No. 23 at 3 (D.S.C. May 27, 2026) ("Where (1) a valid arbitration agreement exists and (2) the claims fall within the scope of the arbitration agreement, the court has no choice but to grant a motion to compel arbitration.") (quoting Adkins v. Lab. Ready, Inc., 303 F.3d 496, 500 (4th Cir. 2002) and citing Chorley Enter., Inc. v. Dickey's Barbecue Rest., Inc., 807 F.3d 553, 563 (4th Cir. 2015)).

In evaluating Stake's Motion to Compel Arbitration, "the Court may consider materials outside of the pleadings, including all relevant, admissible evidence submitted by the parties." Chowdhury v. Merrill Lynch, Pierce, Fenner & Smith Inc., No. 3:21cv799 (DJN), 2022 WL 1105077, at *1 (E.D. Va. Apr. 13, 2022) (citations omitted). "Motions to compel arbitration are evaluated similarly to motions for summary judgment." Eubank v. Camping World RV Sales, LLC, 764 F. Supp. 3d 321, 326 (E.D. Va. 2025) (citations omitted). "When an arbitration agreement contains provisions that encompass the relevant claims, the burden shifts to the party opposing arbitration to 'make an unequivocal denial that an arbitration agreement exists' and to 'show sufficient facts in support.'" Id. (quoting Chorley Enter., 807 F.3d at 564). The party opposing arbitration must do so by "citing to particular parts of materials in the record, including . . . affidavits or declarations" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Boyle, 2025 WL 1674480, at *4 (citing Fed. R. Civ. P. 56(c)(1)).

IV.

In its Motion to Compel Arbitration, Stake contends that plaintiffs unambiguously agreed to arbitrate any dispute with Stake when they created accounts on its platform because plaintiffs "could only have accessed [its] [p]latform after agreeing to the Terms through straightforward methods of notice and assent[,]" and "[t]he Terms include an unambiguous—and mandatory—

10

agreement to arbitrate any dispute related to a user's 'Participation in or other access to or use of the Games or the Platform.'" [Dkt. No. 17] at 1. Stake stresses that the Terms include an opt-out provision, which explicitly allows users to opt out of the arbitration agreement within 30 days of acceptance. Id.; see also [Dkt. No. 17-16] at § 26.9. None of the plaintiffs provided Stake with any form of opt-out notice, thereby confirming their agreement to be bound by the contract. [Dkt. No. 17] at 1. Plaintiffs do not dispute the existence of the arbitration clause, nor do they argue that the issues raised in their Second Amended Complaint fall within the scope of issues subject to arbitration. See generally, [Dkt. No. 37]. Instead, they attack the enforceability of the arbitration agreement. None of the arguments they raise is meritorious.

A.

As an initial matter, plaintiffs raise several arguments that have already been rejected by federal district courts across the country in analogous lawsuits against Stake. Since 2025, at least four lawsuits against Stake—seeking damages and injunctive relief for lost money resulting from Stake's online casino-style games—have been filed, in which Stake has filed a motion to compel arbitration. In each of these cases, Stake's motion to compel arbitration, which involves the same Terms at issue here, were granted with those courts finding no merit to any of plaintiffs' arguments. See Hall v. Sweepsteakes Ltd., No. 3:25-CV-345-RAH, 2026 WL 701560, at *3-5 (M.D. Ala. Mar. 12, 2026) (ordering arbitration after rejecting plaintiff's delegation clause arguments and enforceability arguments); M.M. v. Sweepsteakes Ltd., No. CV 25-11481-RGS, 2025 WL 3240413, at *1 (D. Mass. Nov. 20, 2025) (granting Stake's motion to compel arbitration after rejecting plaintiffs' arguments that consideration was lacking, and that the agreement was void under Massachusetts law as contrary to public policy); Boyle, 2025 WL 1674480, at *5-6 (compelling arbitration after rejecting plaintiff's arguments that "the contract is

11

void because it has an illegal purpose—online gambling" and that "the Arbitration Agreement is unconscionable"); and Dixon, No. 3:25-cv-09641-SAL, Dkt. No. 23 (D.S.C. May 27, 2026) (ordering arbitration after rejecting plaintiff's delegation clause challenges; substantive and procedural unconscionability arguments; attacks on Stake's unilateral modification clause; and argument that the arbitration agreement was unenforceable because it is "predicated on illegal gambling"). For the reasons eloquently stated in Hall, M.M., Boyle, and Dixon, the Court rejects plaintiffs' delegation clause challenges, and their arguments that Stake's Terms are void ab initio because they create an illegal gambling contract. See [Dkt. No. 37] at 16-21. The Court also rejects plaintiffs' argument that the arbitration clause operates as an impermissible prospective waiver of RICO statutory rights and is, therefore, unenforceable as a matter of public policy. See id. at 21-26.

B.

Plaintiffs' additional arguments fare no better. For example, they challenge the authenticity and admissibility of the evidence Stake provided to show that plaintiffs had agreed to the arbitration provision. [Dkt. No. 37] at 12. Specifically, they assert that Stake "must prove formation on a [p]laintiff-by-[p]laintiff basis with competent evidence tying each [p]laintiff to a specific acceptance event and the operative terms[,]" and that "Stake[] has not made that showing for at least seven of the eight named [p]laintiffs." Id. at 11. They also assert that Stake's "interface evidence is not competent proof of formation unless Stake authenticates it as an accurate depiction of what [p]laintiffs actually saw at the relevant time." Id. at 12 (citing Fed. R. Evid. 901(a)).

This challenge fails because Stake has sufficiently established an agreement to arbitrate by providing "undisputed evidence"—through a sworn declaration from Jarrod Anthony

12

Febbraio ("Febbraio"), Director at Stake—that the only way to access the Stake platform is to agree to Stake's Terms and Conditions.[6] [Dkt. No. 40] at 2. Such evidence has been found sufficient by other courts in this district. Accord Melo v. Zumper, Inc., 439 F.Supp.3d 683, 695 (E.D. Va. 2020). Plaintiffs have also failed to "come forward with sufficient facts to place the entitlement to arbitration in dispute." Cole, 2025 WL 2105360, at *3 (citation omitted). "[A]s in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; instead, the party must identify specific evidence demonstrating a material factual dispute." Green v. Zachry Indus., Inc., 36 F.Supp.3d 669, 673 (W.D. Va. 2014) (citation omitted). Although plaintiffs correctly point out that Stake has "no records of any accounts associated with [p]laintiffs other than Tiffany Hines[,]" [Dkt. No. 17-1] at ¶ 7, they have not supported their argument with any declarations by plaintiffs denying that they agreed to the Terms, or any evidence of an alternative way to access the Stake platform without accepting the Terms, which clearly include the arbitration notices, [Dkt. No. 40] at 4. Furthermore, plaintiffs' complaints about Stake's "lack[ of] account-specific records," [Dkt. No. 37] at 11, "ring especially hollow given that [p]laintiffs ignored Stake['s] request for [p]laintiffs' account information[,]" [Dkt. No. 40] at 4 n.1 (emphasis in original).[7] Plaintiffs' allegations therefore do not create a genuine issue of material fact as to their agreeing to arbitrate

---

[6] Attached to Febbraio's sworn declaration are all versions of Stake's Terms and Conditions and screenshots showing what users encounter when creating accounts. [Dkt. No. 17-1]. Febbraio also declared from "personal knowledge" that he is "familiar with the systems and records that, among other aspects, relate to [Stake] account holders' records and account sign-in and sign-up flows[,]" and that the screenshots are "true and accurate" depictions of the registration screens. [Dkt. No. 17-1] at ¶¶ 1, 9-11, 16.

[7] Specifically, Stake asserts that "[a]fter undertaking various searches for accounts corresponding to each of the named [p]laintiffs failed to turn up accounts associated with certain of the named [p]laintiffs, . . . counsel requested that [p]laintiffs provide the usernames and email addresses associated with the accounts that allegedly 'signed up' for Stake[]." [Dkt. No. 17] at 4 n.4. Plaintiffs declined to do so. Id.

their dispute. Boyle, 2025 WL 1674480, at *4; accord Hosseini v. Upstart Network, Inc., No. 19-CV-704, 2020 WL 573126, at *7 (E.D. Va. Feb. 5, 2020) (compelling arbitration where "defendant has come forward with evidence establishing the existence of an agreement to arbitrate" through "declarations attesting to the authenticity" of the agreement and where "plaintiff has failed to rebut" that evidence).

Plaintiffs further argue that Section 28.2, which contains a unilateral modification clause, renders the arbitration agreement illusory for lack of consideration. [Dkt. No. 37] at 7-10. Section 28.2 provides that:

> Stake reserves the right to amend these Terms, or to implement or amend any procedures, at any time. Any amendments will be published on the Platform and such changes will be binding and effectively immediately. If you do not agree to the amended Terms, you must stop using the Platform.

[Dkt. No. 17-16] at § 28.2.

Plaintiffs rely primarily on the Fourth Circuit's recent decision in Johnson v. Cont'l Fin. Co., LLC, 131 F.4th 169 (4th Cir. 2025), cert. dismissed sub nom. Cont'l Fin. Co. v. Johnson, 146 S. Ct. 1367 (2026) to support this argument. Specifically, plaintiffs claim that Johnson stands for the proposition that "[a] unilateral modification clause renders an arbitration promise illusory—and therefore prevents formation—when the drafter retains unfettered discretion to change the arbitration agreement's existence or scope." Id. at 7; see also Hearing Tr. Jun. 16, 2026 at 4:20-24 ("The Johnson case . . . from the Fourth Circuit is directly on point. It says if you are able to unilaterally modify a contract['s] terms and conditions . . . without notice, advance notice, Judge Wilkinson said the contract was never formed."). But Johnson, which was held to apply narrowly only to Maryland law, does not apply here, where Virginia law applies. In fact, the Johnson court explicitly stated that "[i]n reaching our conclusion, we stress that our holding reflects only the judgment of the Maryland courts." Johnson, 131 F.4th at 181.

14

Applying Virginia law, federal courts in this district have held that "unilateral modification provisions in an arbitration agreement do not automatically render the agreement unconscionable[,]" so long as adequate notice of modification is provided. Lovinfosse v. Lowe's Home Centers, LLP., No. 1:23-CV-574 (RDA-LRV), 2024 WL 3732436, at *6 (E.D. Va. Aug. 8, 2024). Although plaintiffs cite to Virginia cases in support of their argument, these cases can be readily distinguished from the facts at hand. For example, Kiser v. Truist Fin. Corp. held that an arbitration agreement was illusory under Virginia law where the agreement included a "change-in-terms clause permit[ting] [defendant] to unilaterally modify the arbitration agreement without providing notice."[8] 796 F. Supp. 3d 207, 237 (E.D. Va. 2025), aff'd, No. 2:24-CV-435, 2026 WL 851950 (E.D. Va. Mar. 20, 2026) (emphasis in original). In reaching this decision, the Kiser court specifically focused on the change-in-terms clause at issue not requiring the defendant "to give notice of unilateral modifications[,]" id. at 238, and failing to "contain any 'provisions saying that continued use will bind parties to modified contract terms[,]'" id. at 233-34 (quoting Gillam v. Branch Banking & Tr. Co. of Virginia, No. 3:17-CV-722, 2018 WL 3744019, at *3 (E.D. Va. Aug. 7, 2018)) (emphasis in original). Similarly, Lovinfosse v. Lowe's Home Centers, LLP. held that an arbitration agreement was illusory under Virginia law where it gave defendant "the power to make . . . changes not only unilaterally, but also without notice."[9]

---

[8] Specifically, the change-in-terms clause stated: "When the laws governing your Account require the Bank to provide you written advance notification of a change to the rules and regulations, the Bank will provide such notice through a letter, account statement message or other written or electronic notice. Unless otherwise prohibited or required by applicable law or regulation, the Bank may change from time to time other provisions of these rules and regulations with or without notice. When these rules and regulations change, a copy of the revised rules and regulations will be available at any office of the Bank or on the Bank's website at www.suntrust.com/rulesandregulations...." Kiser, 796 F. Supp. at 237 (emphasis in original).

[9] The terms at issue in Lovinfosse state: "**You agree that [Defendant] may change, terminate, modify, add, end or delete any of these the terms and conditions (including, without limitation, the Terms) under which the Site is offered at any time and without notice to you.**

2024 WL 3732436, at *6. The Lovinfosse court explained that the unilateral modification provision at issue was problematic because defendant's "position would force customers to constantly have to check [d]efendant's website—in perpetuity—to see if [d]efendant had exercised its unilateral power to modify the terms to which the customer had originally agreed." Id. at *7. In sum, the cases that plaintiffs rely on—including Johnson, Kiser, and Lovinfosse— "involved a modification provision that affirmatively set forth an inadequate notice requirement." [Dkt. No. 40] at 7.

By contrast here, Stake's Terms contain no such language. Section 28.2 requires that "[a]ny amendments will be published on the Platform[,]" "obligat[ing] Stake[] to take affirmative actions to ensure its updated Terms reach Stake[] users." [Dkt. No. 40] at 8. Moreover, the Terms provide users with an "express exit right[,]" stating that "[i]f [a user] do[es] not agree to the amended Terms, [he] must stop using the Platform[.]" Id. at 9. As Stake explained during oral argument, when Stake updates its Terms and Conditions, the platform will "display[] a mandatory acceptance window to all users[,]" which "display[s] the updated version of the Terms and require[s] the user to scroll through them in their entirety before clicking a checkbox indicating that he or she agreed to the updated version of the Terms" in order to be able to continue accessing the platform. Hearing Tr. June 12, 2026 at 10:15-11:15 (citing [Dkt. No. 17-1] at ¶¶ 14-16). Stake displayed such a mandatory acceptance window when it updated its Terms and Conditions in May 2023, and again in August 2025. [Dkt. No. 17-1] at ¶¶ 14-15. An image of the mandatory acceptance windows displayed to users is shown below, with a red arrow added by the Court showing the relevant language:

---

[Defendant], in its sole and absolute discretion, reserves the right to update, change, terminate, suspend, modify, add, end or delete any of these Terms, ... in whole or in part, at any time with or without notice." Lovinfosse, 2024 WL 3732436, at *6 (bolding in original).



Id. at ¶ 16.

Furthermore, contrary to plaintiffs' assertions that any modifications of Stake's Terms are "buried in the Terms and Conditions of the website[,]" [Dkt. No. 37] at 10, such changes are highlighted at the beginning of Stake's Terms, in Section 1, which includes a chart that displays the history of the Terms, when they were published, and a brief description of the changes in the Terms. See [Dkt. No. 17-16] at § 1. Accordingly, unlike the unilateral modification provisions at issue in Kiser and Loveinfosse, which forced customers "to constantly have to check [d]efendant's website—in perpetuity—to see if [d]efendant had exercised its unilateral power to modify the terms to which the customer had originally agreed[,]" Stake's Terms provide clear and adequate notice to its users of any amendments, and gives them the option of whether to

accept such terms before continued use.[10] <u>Loveinfosse</u>, 2024 WL 3732436, at *7. Lastly, "even assuming the modification provision was problematic," plaintiffs have not explained why the modification clause "could [not] be severed from the remainder of the agreement to avoid invalidating it in its entirety." <u>Dixon,</u> No. 3:25-cv-09641-SAL, Dkt. No. 23 at 8; <u>see also</u> <u>In re Cotton Yarn Antitrust Litig.</u>, 505 F.3d 274, 292 (4th Cir. 2007) (holding that if provisions of the agreement at issue are found to be unenforceable, "the district court must then consider whether severance of the [provisions at issue], rather than invalidation of the arbitration agreements, would be the appropriate remedy."); <u>Daston Corp. Seev. MiCore Solutions, Inc.</u>, No. CL-2010-9318, 2010 WL 7375597, at *5 (Va. Cir. July 30, 2010) ("[u]nenforceable provisions may be severed from a contract and the remainder of the contract enforced") (citation omitted).

Focusing on Stake's pre-May 2023 "Play Now" interface, plaintiffs argue that Stake failed to provide clear and conspicuous notice of the arbitration agreement. [Dkt. No. 37] at 14-15. Specifically, plaintiffs contend that the pre-May 2023 interface "stated only that users 'indicated that [they] had read and acknowledge[d] the Terms & Conditions[;]'" that "acknowledge" does not mean "agree[;]" and "Play Now" does not mean an agreement to arbitrate. <u>Id.</u> This distinction has been rejected by the Fourth Circuit, which has found that clicking to manifest assent "does not mean the button must be labeled 'I accept' or 'I agree.'" <u>Dhruva v. CuriosityStream, Inc.</u>, 131 F.4th 146, 155 (4th Cir. 2025).

The pre-May 2023 "Play Now" interface provided clear and conspicuous notice to users that by clicking the button, they were acknowledging that they read and acknowledged the Terms

---

[10] In fact, the <u>Kiser</u> court suggested that if defendant "posted the modified agreement on [plaintiffs'] online banking portal, such that they would be on notice of it," or if plaintiffs "had to acknowledge the modified agreement[,]" that would be sufficient to constitute "reasonable notice of a modification." <u>Kiser</u>, 796 F.Supp. at 238 n.29. Here, Stake has done both.

and Conditions. [Dkt. No. 17] at 2. Moreover, regardless of when each plaintiff first created a Stake account, the Second Amended Complaint, which was filed in 2026, alleges that plaintiffs "are Stake[] users" and "continue to participate" on the Stake platform. [Dkt. No. 49] at ¶ 24. Accordingly, the more explicit Terms that went into effect starting May 2023 apply to the plaintiffs. Because those Terms display a mandatory scrollwrap acceptance window, which requires all active users to scroll through and accept the updated Terms before being able to access the Stake platform, plaintiffs' arguments regarding the pre-May 2023 interface are irrelevant. See [Dkt. No. 17-1] at ¶¶ 14-16. For all of these reasons, Stake's Motion to Compel Arbitration, [Dkt. No. 16], will be granted.

## C.

Plaintiffs' last argument is that even if arbitration is compelled as to their claims against Stake, their claims against Kick, Drake, Ross, and Nguyen should proceed simultaneously because these defendants are not subject to the arbitration agreement. [Dkt. No. 37] at 26. The Court rejects this argument because any liability these defendants might have would be directly affected by the results of the arbitration. Singh v. Interactive Brokers LLC, 219 F. Supp. 3d 549, 562-63 (E.D. Va. 2016) ("[A] district court may, in its discretion, stay the litigation of non-arbitrable claims like those against [non-arbitrating] [d]efendants if the court deems it necessary or advisable," including where "arbitrable and non-arbitrable issues are so intertwined that the resolution of the former directly impacts the resolution of the latter."). For all these reasons, this entire civil action will be stayed by an Order to be issued with this Memorandum Opinion. Specifically, Stake's Motion to Compel Arbitration, [Dkt. No. 16], will be granted; Stake's Motion to Dismiss, [Dkt. No. 18], will be denied as moot; and Kick's Renewed Motion to

19

Dismiss, [Dkt. No. 50], Stake's Motion to Strike Unauthorized Amendments, [Dkt. No. 52], and

Stake and Kick's Joint Motion to Deny Class Certification, [Dkt. No. 54], will be stayed.

Entered this 30 day of July, 2026.

Alexandria, Virginia

                                                          /s/
                                    _____
                                    Leonic M. Brinkema
                                    United States District Judge